*If this opinion indicates that it is "FOR PUBLICATION," it is subject to
revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

*In re* M. A. JOHNSON, Minor.

UNPUBLISHED
August 22, 2024

No. 369040
Washtenaw Circuit Court
Family Division
LC No. 18-000124-NA

Before: REDFORD, P.J., and GADOLA, C.J., and RIORDAN, J.

PER CURIAM.

Respondent-father[1] appeals as of right the trial court order terminating his parental rights to the minor child under MCL 712A.19b(3)(h) (parent is imprisoned for such a period that the child will be deprived of a normal home for a period exceeding two years). We affirm.

## I. FACTS AND PROCEEDINGS

The minor child, MJ, was born in December 2018 with cocaine and methadone in his system because his mother used drugs during her pregnancy. MJ suffered withdrawal symptoms and remained hospitalized for 10 days. During that time, respondent visited MJ at the hospital and held himself out to be MJ's father. However, respondent declined to sign an affidavit of parentage until he could obtain a DNA test to prove that he was MJ's biological father. Respondent later signed an affidavit of parentage in October 2019. When MJ was discharged from the hospital, MJ's maternal aunt became his foster parent and raised MJ throughout the pendency of the case.

Two months after MJ was born, respondent was arrested for two counts of assault with intent to do great bodily harm less than murder and three counts of possession of a firearm during

---

[1] The trial court terminated the mother's parental rights to the minor child in November 2020. A panel of this Court affirmed the trial court's order. *In re M A Johnson*, unpublished per curiam opinion of the Court of Appeals, issued July 22, 2021 (Docket No. 355551). Because the minor child's mother is not a respondent or party to this appeal, all references to "respondent" refer to respondent-father.

the commission of a felony. Respondent was convicted of those charges, and he was sentenced to 4 to 10 years' imprisonment for the assault convictions and 2 years' imprisonment for each felony-firearm conviction.

In January 2021, the Department of Health and Human Services (DHHS) filed a petition alleging that respondent was in prison; the earliest date that he would be eligible for parole was February 18, 2025; respondent had a history of domestic violence involving respondent-mother; and respondent made no plan of care for MJ. During his incarceration at the Washtenaw County Jail, respondent asked the DHHS to allow his mother to take custody of MJ, but, despite the foster-care worker's request, respondent's mother failed to provide information to be considered as a placement for MJ.

As respondent requested, the trial court conducted a jury trial on the allegations in the petition, and the jury decided that petitioner proved that respondent, when able to do so, neglected or refused to provide proper or necessary support and care for MJ. The trial court entered an order of adjudication and ordered the DHHS to provide respondent a case service plan and virtual parenting-time visits with MJ. It is undisputed that respondent completed the requirements of his case service plan to the extent that services were available to him in prison and that he regularly attended virtual parenting-time visits with MJ. However, in August 2022 and October 2022, the DHHS filed supplemental petitions to terminate respondent's parental rights.

Following a termination trial, the trial court ruled that there was clear and convincing evidence of grounds for termination under MCL 712A.19b(3)(h) and that termination of respondent's parental rights would be in MJ's best interests. Respondent now appeals.

## II. ANALYSIS

### A. GROUND FOR TERMINATION

Respondent argues that the trial court erred by finding that grounds for termination under MCL 712A.19b(3)(h) were established by clear and convincing evidence. We disagree.

We review "for clear error the trial court's finding that there are statutory grounds for termination of a respondent's parental rights." *In re Atchley*, 341 Mich App 332, 343; 990 NW2d 685 (2022). Clear error occurs "if the reviewing court has a definite and firm conviction that a mistake has been committed . . . ." *In re BZ*, 264 Mich App 286, 296; 690 NW2d 505 (2004). "When applying the clear-error standard in parental termination cases, 'regard is to be given to the special opportunity of the trial court to judge the credibility of the witnesses who appeared before it.' " *In re Mota*, 334 Mich App 300, 320; 964 NW2d 881 (2020), quoting *In re Miller*, 433 Mich 331, 337; 445 NW2d 161 (1989).

To establish grounds for termination under MCL 712A.19b(3)(h), clear and convincing evidence must show the following:

> "The parent is imprisoned for such a period that [1] the child will be deprived of a normal home for a period exceeding 2 years, *and* [2] the parent has not provided for the child's proper care and custody, *and* [3] there is no reasonable expectation that the parent will be able to provide proper care and custody within a

reasonable time considering the child's age." [*In re Mason*, 486 Mich 142, 160-161; 782 NW2d 747 (2010), quoting MCL 712A.19b(3)(h) (alterations in original).]

The statute explicitly contemplates that a parent who will be incarcerated for a period that will deprive the child of a normal home for more than two years may provide for the child's care and custody during the parent's incarceration. *Mason*, 486 Mich at 161.

Respondent committed the crimes for which he was arrested, jailed, and imprisoned in February 2019. Respondent testified that his earliest chance for parole was February 2025, which would mean that he could not provide care or custody for MJ for more than two years and that MJ would need to reside outside his home for that period. Although MJ was two months old when respondent was arrested, respondent had not taken care or custody of MJ at any point before his arrest, and no evidence suggested he ever had a plan to do so. Nevertheless, respondent takes issue with the second element of MCL 712A.19b(3)(h) and maintains that, because MJ lived with MJ's maternal aunt, respondent did not need to provide for MJ's care or custody during his incarceration.

Throughout the case, the foster-care worker asked respondent if he had any plan of care for MJ, and respondent replied that he did not. At one point, respondent asked that MJ be placed with one of his relatives instead of MJ's maternal aunt, but respondent's mother did not engage with the DHHS to be considered as a potential placement for MJ even after the foster-care worker made inquiries.

Respondent is correct that, in *Mason*, 486 Mich at 163-164, our Michigan Supreme Court ruled that a parent's duty to provide for the proper care and custody of children while in prison may be satisfied if the children were already placed with that parent's relative. Although evidence showed that the children's mother in *Mason* arranged for the children to be cared for by the respondent-father's family, these were "presumably the very people with whom [the respondent-father] would have voluntarily placed them had the DHHS not already taken custody of them by the time respondent was notified of [the mother's] neglect." *Id*. For that reason, the respondent-father in *Mason* did not need "to make ongoing arrangements with the relatives that would permit him to preserve his rights and remain in contact with his sons." *Id*. at 164.

Unlike in *Mason*, MJ was placed with a maternal relative, not a relative of respondent. Further, no evidence showed that respondent suggested that the maternal aunt should be MJ's caregiver, and only later in the case did he concede that MJ's life should not be disrupted with a move to another foster home. For those reasons, the facts of this case do not raise a presumption that respondent would have arranged for MJ's maternal aunt to care for MJ if he had done so himself. Further, unlike in *Mason*, respondent did not have his own family caring for MJ so that he could preserve his rights and remain in contact with MJ while in prison without the intervention of the court.

Respondent also cites *In re Baham*, 331 Mich App 737; 954 NW2d 529 (2020), to support his claim that he did not need to provide any further care or custody to MJ. In *Baham*, this Court ruled that, even though the DHHS removed the minor child from the respondent's custody before the respondent had the chance to plan care for the child, because the respondent thereafter worked with the DHHS to have the child placed with her brother while she was incarcerated, she provided

for the child's proper care and custody. *Id*. at 754. *Baham* also differs from this case because respondent did not work with the DHHS to have MJ placed in anyone's care before or after MJ was removed from his custody, and he did not plan to have MJ cared for by one of his own relatives during his incarceration.

For the reasons stated, the trial court did not clearly err by ruling that petitioner proved MCL 712A.19b(3)(h) as a ground to terminate respondent's parental rights because petitioner presented clear and convincing evidence that respondent would be incarcerated for more than two years; that MJ would not be in a normal home for that time; that respondent did not take steps to plan for, support, or arrange for MJ's care during his incarceration; and that respondent would be unable to take care or custody of MJ within a reasonable time in light of MJ's age.

## B. BEST INTERESTS

Respondent argues that the trial court should have considered a resolution other than termination of his parental rights and that its failure to do so violated his right to due process. We disagree.

Although respondent urged the trial court to consider a guardianship, he did not argue that the trial court's failure to choose an alternative remedy other than termination of his parental rights amounted to a constitutional violation. Therefore, this issue is not preserved for appellate review. See *In re Utrera*, 281 Mich App 1, 8; 761 NW2d 253 (2008). Constitutional questions are reviewed de novo when preserved. *In re Sanders*, 495 Mich 394, 403-404; 852 NW2d 524 (2014). However, this unpreserved issue is reviewed for plain error affecting respondent's substantial rights. *Utrera*, 281 Mich App at 8-9, citing *People v Carines*, 460 Mich 750, 763, 774; 597 NW2d 130 (1999). "Generally, an error affects substantial rights if it caused prejudice, i.e., it affected the outcome of the proceedings." *Utrera*, 281 Mich App at 9 (citation omitted). To the extent that respondent argues that the trial court erred in its best-interest findings, this Court reviews this issue for clear error. See *In re Jones*, 286 Mich App 126, 129; 777 NW2d 728 (2009).

"Once a statutory basis for termination has been shown by clear and convincing evidence, the court must determine whether termination is in the child's best interests." *In re LaFrance*, 306 Mich App 713, 732-733; 858 NW2d 143 (2014), citing MCL 712A.19b(5). "Best interests are determined on the basis of the preponderance of the evidence." *In re LaFrance*, 306 Mich App at 733. In its best-interest determination, the trial court should consider a variety of factors that may include

> the child's bond to the parent, the parent's parenting ability, the child's need for permanency, stability, and finality, and the advantages of a foster home over the parent's home. The trial court may also consider a parent's history of domestic violence, the parent's compliance with his or her case service plan, the parent's visitation history with the child, the children's well-being while in care, and the possibility of adoption. [*In re White*, 303 Mich App 701, 713-714; 846 NW2d 61 (2014) (quotation marks and citations omitted).]

A trial court may also consider how long the child has lived in foster care or with relatives and the likelihood that "the child could be returned to [the parent's] home within the foreseeable future, if at all." *In re Frey*, 297 Mich App at 248-249.

"The Fourteenth Amendment of the United States Constitution provides that '[n]o State shall . . . deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws.' " *Sanders*, 495 Mich at 409, quoting US Const, Am XIV, § 1. "Included in the Fourteenth Amendment's promise of due process is a substantive component that 'provides heightened protection against government interference with certain fundamental rights and liberty interests.' Among these fundamental rights is the right of parents to make decisions concerning the care, custody, and control of their children." *Sanders*, 495 Mich at 409 (citations omitted). See also *In re Beck*, 488 Mich 6, 11; 793 NW2d 562 (2010) (stating that parents have a "fundamental liberty interest in the care, custody, and control of their children") (quotation marks and citation omitted).

However, both the United States Supreme Court and the Michigan Supreme Court have held that a parent's right to control the custody and care of his or her child is not absolute because the state has a legitimate interest in protecting "the moral, emotional, mental, and physical welfare of the minor" and, in certain circumstances, "neglectful parents may be separated from their children." *Sanders*, 495 Mich at 409-10, citing *Stanley v Illinois*, 405 US 645, 652; 92 S Ct 1208; 31 L Ed 2d 551 (1972). Nonetheless, all parents have "the right to an adjudication" before the state deprives "them of the right to direct the care, custody, and control of their children," and parents are "constitutionally entitled to a hearing on their fitness before their children are removed from their custody." *Sanders*, 495 Mich at 418. If a court finds by a preponderance of the evidence that one or more of the statutory grounds for jurisdiction alleged in a petition filed by the state exists, then "the adjudicated parent is unfit," and the court assumes jurisdiction over the child. *Id*. at 405-406.

Once a trial court assumes jurisdiction over a child, the court "has broad authority in effectuating dispositional orders" that are "appropriate for the welfare of the juvenile and society in view of the facts proven and ascertained." *Id*. at 406 (quotation marks and citation omitted). For that reason, once a court assumes jurisdiction over a child, the state's interests in protecting the child prevail over the parent's constitutional rights. *Id*. Then, a trial court "may terminate a parent's parental rights to a child if the court finds, by clear and convincing evidence," that one or more of the statutory grounds for termination in MCL 712A.19b(3) exist and if the trial court finds by a preponderance of the evidence that termination of parental rights is in the child's best interests. MCL 712A.19b(3) and (5). See also *In re Moss*, 301 Mich App 76, 82, 90; 836 NW2d 182 (2013).

Respondent maintains that due process required the trial court to consider the less-drastic solution of guardianship before terminating respondent's parental rights.

An appointment of a guardian may occur to avoid the initiation of termination proceedings. See *In re TK*, 306 Mich App 698, 705; 859 NW2d 208 (2014). "[T]he appointment of a guardian is only appropriate after the court has made a finding that the child cannot be safely returned to the home, yet initiating termination of parental rights is clearly not in the child's best interests." *Id*. at 707. But under any circumstance, a trial court may only appoint a guardian if "it is in the child's best interests to appoint a guardian." *Id*.

Contrary to respondent's argument, the trial court explicitly considered and eliminated the alternative remedy of guardianship. After the first day of the termination trial, the trial court adjourned the trial so that the parties could negotiate an alternative to termination under the circumstances of the case. However, when the trial resumed, MJ's maternal aunt, who raised MJ since he was 10 days old, testified that she would be willing to adopt MJ, but she was not willing to participate in a guardianship as respondent wished. The maternal aunt reasoned that MJ lived with her his entire life of nearly five years and that the mother appeared to be involved in respondent's attempts to retain his parental rights to MJ because she wanted to parent MJ, notwithstanding that her parental rights were terminated.

Because of her interactions with them, it appeared to the maternal aunt that respondent and the mother were acting in concert instead of respondent acting on his own to be a father to MJ, and the maternal aunt was afraid that the mother would continue to manipulate respondent to reach her goal of parenting MJ, as she had done with respondent's family. Indeed, when the foster-care worker and the maternal aunt encouraged MJ to visit with respondent's family, the maternal aunt learned that respondent's family was allowing the mother to spend time with MJ even though her parental rights were terminated. To avoid the mother's involvement with MJ, which was contrary to the trial court's order, the maternal aunt told respondent's family that they could visit MJ at her house, but they chose not to do so.

After the first day of respondent's termination trial, when the trial court instructed the parties to work to find an alternative to termination, the mother announced on social media that MJ would be returning home to her and respondent. The maternal aunt also testified that the mother tried to interfere with her parenting of MJ by calling Children's Protective Services (CPS) with baseless concerns after respondent shared information with the mother about his case. The mother also attended respondent's termination trial and had to be asked to leave the courtroom during the maternal aunt's testimony because her relationship with the maternal aunt was so contentious.

Respondent argues that the mother's actions should have no bearing on his rights to parent MJ. Respondent's point is well-taken that his right to parent his child belongs to him. However, the record also reflects that respondent maintained regular communication with the mother while incarcerated and that he was aware of the maternal aunt's concerns about her conduct. Respondent nonetheless planned to remain friends with the mother after he was released from prison. The maternal aunt maintained that she did not believe that respondent could put aside his relationship with the mother to make MJ his priority, which was another reason she did not want to be involved in a guardianship.

The record reflects that the trial court considered a guardianship in lieu of termination and eliminated it as a possibility, ultimately deciding that a guardianship was not in MJ's best interests. Further, that the trial court rejected this alternative does not mean that the trial court deprived respondent of his due-process rights. By the time of the termination trial, no one argued that MJ should be removed from the maternal aunt's care because MJ had lived with the aunt and her family for nearly five years, and they were the only family MJ ever knew.

Because the maternal aunt was unwilling to participate in a guardianship, the alternative would have been to remove MJ from her care and place him with someone who would act as his

guardian so that respondent could maintain a relationship with MJ and potentially take over his care. A guardian must accept the appointment, submit to personal jurisdiction of the court, and must perform all required duties. *In re Prepodnik*, 337 Mich App 238, 243-244; 975 NW2d 66 (2021). The guardian must also comply with any restrictions and limitations in the letters of authority and must also participate in annual review hearings and any other hearings deemed necessary by the court. *Id*. at 244-245. MJ's maternal aunt testified that it was difficult for her to care for MJ while also complying with court orders, CPS visits, and any and all requirements of the DHHS. She expressed that she wanted to be free from restrictions on her ability to be a parent to MJ, which was another reason she wanted to legally adopt MJ rather than act as his guardian. Under the circumstances, the trial court did not clearly err by deciding that termination of respondent's parental rights was in MJ's best interests rather than a guardianship.

The trial court also did not clearly err by ruling that termination was in MJ's best interests. Although placement with a relative ordinarily weighs against termination, MCL 712A.19a(6)(a), a trial court may nonetheless terminate parental rights if it finds that termination is in the child's best interests. *In re Olive/Metts*, 297 Mich App 35, 43; 823 NW2d 144 (2012). The record reflects that the trial court considered the maternal aunt's custody of MJ as a potential reason to allow a guardianship rather than termination, until it became clear that the maternal aunt did not wish to be MJ's guardian for the reasons described. The trial court observed that MJ had special emotional and behavioral needs for which he needed consistent, stable, and ongoing care and that his maternal aunt showed a willingness and commitment to do whatever MJ needed to give him the best chance to manage these issues.

The trial court also noted that MJ had lived with the maternal aunt for such a significant period that they were the only family he knew. The aunt testified that MJ was very close to her other boys, and she treated him as her own son. In contrast, respondent was not able to form a bond with MJ during virtual parenting-time visits, and, although respondent testified that he felt a bond with MJ, MJ did not enjoy or participate in parenting-time visits unless he could play games on his iPad throughout. The trial court also observed that MJ would be seven years old or older if respondent was released from prison in 2025, and respondent would need additional time to establish a home and income to support MJ thereafter. The trial court concluded that it would be very traumatic for MJ to be reunited with respondent at that time. The trial court explained that MJ already had significant problems with separation anxiety and trauma because of the ongoing parental-rights cases. The trial court declined to put him through that again. On the basis of this evidence, the trial court did not clearly err by ruling that termination of respondent's parental rights was in the best interests of MJ.

Affirmed.

/s/ James Robert Redford
/s/ Michael F. Gadola
/s/ Michael J. Riordan